[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings:
By petition filed on April 20, 1990, the Department of Children and Youth Services (DCYS) seeks to terminate the parental rights of Sharon M., mother, and lacking an adjudicated or acknowledged father for either child, sole legal guardian of Joseph W. (Joey) and Lionel J., alleging all four of the nonconsensual grounds set forth in subsection (b) of Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1989) applicable to children who, like these, were previously committed to DCYS as neglected or uncared for pursuant to Sec. 46b-129.
Sharon appeared at the initial hearing on May 17, 1990 and returned to court on May 22, 1990 for a pretrial conference. With the advice of the court-appointed counsel, she agreed to participate in a psychological evaluation to be CT Page 72 conducted (pursuant to subsection (d) of Sec. 45-61f, incorporated by reference into subsection (b) of Sec. 17-43a) by the same clinical psychologist who had evaluated her and these children two years earlier. Trial was delayed to secure completion of this evaluation and evidence offered in four days of trial between September 17, 1990 and December 10, 1990. All parties rested following the hearing of December 10, 1990 and were given to January 11, 1991 for the submission of trial memoranda. The period of reserved decision thus commences on the latter date.
Facts
Evidence offered at trial, interpreted in the light of the prior court record concerning this respondent and her children, of which judicial notice is taken, supports the finding of the following facts:
Sharon M. left school at 16 when when pregnant with the first of six children to be born to her out of wedlock over the next seven years. In May of 1990 her first child, born with multiple handicaps in 1983, was voluntarily released for adoption. Sharon was 18 when her second son was born, a child who has been raised from an early age by the maternal grandmother. Sharon admits that she began to use cocaine at the age of 19, three days after giving birth to her third child, Joey, on January 28, 1986, born with both height and weight at less than the 5th percentile for the population. (State's Exhibit D.) These three oldest children were all admitted to the hospital in September of 1986 "due to the mother's use of I.V. drugs and poor care for the children." (Id., Social Service note, October 1, 1986.) Joey, then eight months old, was diagnosed as a child who was failing to thrive — having fallen even below his original low birth curve — and as having delayed bone growth: "Findings suggestive of fetal alcohol effects but cannot confirm it." (Id., discharge summary, October 8, 1986.)) The following year, at the time her fourth son (Lionel) was born on September 11, 1987, Sharon admitted that she had been smoking cocaine. (Id.)
Less than a year later, on July 25, 1988, after Joey, Lionel and their handicapped five-year old brother were found unattended for the third time in less than five months, the police intervened, the children placed in the temporary custody of DCYS, and the mother arrested. DCYS had apparently prepared, but failed to file, neglect petitions after the second episode had occurred in May of 1988. Petitions were filed on July 27, 1988, however, but the mother failed to appear for the first two scheduled hearings. She did appear on the third scheduled hearing, September 20, 1988, when, with the CT Page 73 advice of her attorney, she agreed to participate in a psychological evaluation to be conducted in October of 1988. She kept the appointment for the clinical evaluation in October, but failed to appear at any subsequent hearings, Her whereabouts thereafter became unknown to her family, to DCYS, and to her attorney, and remained so for the next 14 months. On January 19, 1989, the children were adjudicated, by default, to be neglected by reason of abandonment and committed to DCYS.
In her testimony in this proceeding (October 4, and December 10, 1990), Sharon admitted leaving Connecticut immediately after Joey and Lionel had been placed in temporary custody in July of 1988. She had moved to New York with her latest boyfriend, Mr. D.D., who had "offered to build a life for me and the kids." (Testimony on October 4, 1990.) She did not reveal to her attorney, who had appeared with her in court on September 20, 1988, or to the psychologist who evaluated her a month later (State's Exhibit J) that she was being held in New York against her will. When she reappeared in Connecticut 14 months later, however, she claimed to have been held a hostage by Mr. D. D. for over a year during which she had given birth to the first of their children in April of 1989 and had become pregnant soon after with their second. She testified that she had been unable to reveal her hostage status to the hospital staff in New York at the time of giving birth in April of 1989, or to the prenatal clinic which she attended with her subsequent pregnancy. According to her account at trial, she had only escaped in December of 1989 when she had gone to a hospital for a prenatal visit leaving Mr. D.D. behind (in the place where she was being kept a "prisoner) to babysit for their eight-month old infant. Her accounts of her whereabouts from July of 1988 to December of 1989 varied widely: In her first psychological evaluation on October 19, 1988 (State's J.) she claimed to have spent only 10 days in New York (Id., p. 2); in her testimony and the later evaluations with the same psychologist (State's Exhibit C., evaluations conducted July 13, 1990) and September 10, 1990), she claimed to have spent all but two weeks in New York in that 17-month period.
During Sharon's absence from the lives of Joey and Lionel, they had suffered a number of foster placements. Originally placed together in a foster home that proved inadequate to meet their multiple needs, both were replaced, in different homes, in September of 1988. Lionel was placed in the specialized foster home of Mrs. K. who testified on September 17, 1990 that at the age of one year he could not walk, crawl, feed himself, sit or talk. He cried constantly, arching his back, was unusually clinging and displayed multiple fears. Cooperating closely with an early intervention program, CT Page 74 Mrs. K. was able to modify these behaviors: After two years in her home, Lionel now sleeps through the night and developmentally is approaching normal. After 11 months in another foster home, Joey joined Lionel in Mrs. K.'s home in August of 1989. Although then three and a half, he could not yet talk and appeared not to understand the speech of others, evidencing developmental delays in all other areas as well. After only one year with Mrs. K. he has closed most of the developmental gaps, although his language remains considerably delayed.
On July 3, 1989, nearly a year after the children's emergency placement in foster care and with their mother's whereabouts still unknown, DCYS wrote to the court, in response to an inquiry about permanent planning, that it intended to file petitions seeking to terminate parental rights "in the immediate future." It did not do so. Five months later, in December of 1989, after 14 months of no contact, during which she had occasionally called her father's home in Connecticut without leaving an address or telephone number, Sharon called DCYS and requested a visit. The DCYS social worker, considering the children's condition at placement and the length of time since they had seen their mother, asked her first to come into the office for an appointment before setting up the first visit. She did not do so, later giving as her reason the fear of being "put in jail for abandoning the kids." (Testimony of Sharon M. of October 4, 1990.) The next contact was not initiated by Sharon but by the DCYS worker after learning from Mr. D. D. how to reach her. When called by DCYS, Sharon expressed surprise at hearing from the social worker. Asked why she had not called back in connection with resuming visits with the children, Sharon replied that she had been having problems with "the father" — presumably Mr. D.D. (Testimony of social worker Meldrum, September 17, 1990.) Sharon agreed to begin with visits in the DCYS office, the first of which took place January 25, 1990. At first the children did not know who she was and when told that she was their mother, they "looked blank." (Id.) The visit went without incident, however, and subsequent visits were arranged for February and March when the social worker referred Sharon to a drug treatment program in view of her admitted four-year problem with cocaine and the advanced stage of her sixth pregnancy. At first Sharon resisted the suggestion, claiming drugs were no problem for her (Id.) but later agreed to enter the 21-day in-patient program at the University of Connecticut Health Center. Seven days later she was permitted to leave after complaining that she was unable to sleep at the hospital, and to transfer to the extended day-treatment program. On her original admission to the hospital April 11, 1990 she had tested positive for both cannabinoids and cocaine. (State's CT Page 75 Exhibit A., discharge summary, p. 3.)
Although Sharon testified on October 4, 1990 that she had completed the drug program, attending weekdays from 8:00 a.m. to 2:30 p.m. for the balance of the 21 days, and produced a certificate of completion (Respondent's Exhibit 1), the hospital record revealed that she had left the in-patient program April 18, 1990, did not enter day-treatment until May 2, 1990, attended three times and missed twice before delivering her sixth son on May 14, 1990. The newborn tested positive for cocaine which Sharon admitted using shortly before she delivered. She gave a variety of reasons for failing to return to day-treatment after the baby's birth: The baby was little; she had no babysitter; the baby had a cold; the counsellor had told her she could return whenever she was ready to do so. After being brought to the emergency room of the hospital on June 2, 1990 for an overdose of cocaine and marijuana, Sharon did return briefly to the day-treatment program, but was discharged for nonattendance on June 18, 1990. She re-entered the program on August 21, 1990 after both of her children by Mr. D.D. were placed by DCYS at the request of a babysitter with whom they had been abandoned, but was again discharged for nonattendance on September 2, 1990. (State's Exhibit A.). In her last day of testifying, on December 10, 1990, Sharon claimed to have signed up for a new drug program at Community Health Services, but had missed her initial appointment which she had made for the same day as a scheduled visit with her children. She denied being admitted to St. Francis Hospital for an overdose of cocaine and marijuana on June 2, 1990, notwithstanding the hospital record in evidence. (State's Exhibit A.). In testimony she denied using drugs the day she delivered her youngest child, notwithstanding the hospital record to the contrary. She denied using a half gram of cocaine twice weekly in April of 1990, as the hospital record of her University of Connecticut admission documents, and when confronted with these records responded that "The records are very much wrong." Under cross-examination, Sharon had no explanation for her failure to inform DCYS or Dr. Mantell in October of 1988 that she was being held in New York against her will, or to inform the doctors in New York at the time of delivering the child born in April of 1989. Questioned about the hospital diagnosis of Joey's failure to thrive at the age of eight months, she responded, "I never knew any of my kids were malnourished in my care."
Shortly after the birth of her sixth child on May 14, 1990, another office visit with Joey and Lionel took place on May 31, 1990, the fourth since her return to Connecticut. Because this went well, Sharon was permitted to start visiting at their foster home, the social worker driving her there for CT Page 76 the first visit on June 28, 1990. She has made no further visits to the foster home since that time nor has she given lack of transportation as her reason for not doing so. She saw her children at the two clinical evaluations of July 13, 1990 and September 10, 1990. A visit was scheduled for November 6, 1990, which Sharon cancelled for a job interview. Another visit was scheduled for December, which she cancelled because of an appointment to start drug counselling at the Community Health Center for the same time and date. She later testified she missed that appointment because of the scheduled visit with the boys. When the social worker offered to make up the missed visit a week later, Sharon declined. In cross-examination Sharon admitted having three drug relapses in six months in 1990, but claimed that that did not mean she had "relapsed a lot." She recalled no lacks in her care of her children other than leaving her older boys on a single occasion in 1988. She acknowledged that Joey and Lionel do not know her as their mother, and regard Mrs. K. as their "mommy."
After his interview with Sharon and the boys on July 13, 1990, Dr. Mantell reported that "there is no evidence of an ongoing parent and child relationship." Although "the children appear to know their mother . . . there is no evidence to indicate that the children see her as a psychological parent." There was no indication that the children had had any memories of, or emotional ties with, their mother before she re-entered their lives six months earlier. Dr. Mantell found Sharon
 . . . . to be seriously, characterologically impaired, the impairment apparently being of an antisocial personality disorder variety . . .
He recommended that the children remain in the foster home pending a full psychological examination of the mother and an evaluation of hex capacity to rehabilitate. Two months later — during which Sharon initiated no further visits with these children — Dr. Mantell observed the family again. This time he found the mother to be an "unreliable historian" who admitted continuing her substance abuse but was unable "to maintain a therapeutic relationship at this time." Seeing Sharon again with her children, he still found "no evidence of an ongoing relationship" as contrasted with a clear demonstration that Mrs. K. was the psychological mother of both boys. (State's Exhibit C, September 10, 1990 segment, p. 9).
 The data appears consistent in indicating that Sharon M. is significantly psychologically handicapped and unable to develop and discharge an appropriate childcare relationship with her children. (Id., p. 10). CT Page 77
He found only a remote likelihood that Sharon could "make a sudden and complete rehabilitation of such strength that she could immediately begin to establish a meaningful relationship with her children." For this she would need to demonstrate freedom from drug use, some kind of constructive daily activity and a demonstrated improved ability to master the daily tasks of her own living "while seeing her children on a regular basis." Since none of this appeared likely to occur, and since he found the boys "strongly bonded to their foster mother" and "not bonded to their natural mother," he recommended that they be freed at once for adoption, preferably with Mrs. K. and if that proved impossible, then adoption by strangers. In his testimony of November 14, 1990, Dr. Mantell, considering the total absence of any relationship between mother and sons and her denial of any drug problem just three days after her second discharge from the UConn program for noncompliance on September 2, 1990, called her prognosis "very discouraging." He inferred from the fact that she had given birth to six children by the age of 23 that she was "careless, irresponsible" and demonstrated "very poor judgment." Although Sharon admitted to Dr. Mantell last using cocaine four weeks earlier, in August of 1990, and then three months before that, in May when her last child was born, she nonetheless continued to assert that she had no problem with drugs. Dr. Mantell found it significant that after describing the kidnapping and violence at the hands of Mr. D.D., Sharon was anxious to speak to him at the conclusion of the September 10, 1990 evaluation, and did so without strain seeming to be relaxed and "cautiously inviting": "I was having a hard time understanding that." Even if her prolonged absence from her children had been caused by the alleged kidnapping and threatened violence by Mr. D.D., Dr. Mantell still recommended termination of Sharon's parental rights in order to secure the permanency they require after two and a half years in foster care. When he had first met these children and their mother two years earlier (in October of 1988) he had found no parent-child relationship existing then, even though they had only been separated for three months at the time. It was not surprising, then, that after two years had gone by with no contact until January of 1990, and thereafter less than one time a month, there should still be no suggestion of a parent-child relationship between them. In Dr. Mantell's opinion, considering her nearly five-year drug history, it would take one full year of sobriety and stability before he could predict even a 50-50 chance for a permanent rehabilitation.
In a second observed interaction between Sharon and these boys on September 10, 1990, which was their seventh CT Page 78 meeting in eight months, Sharon sat in a chair which Mrs. K. had occupied earlier. Joey immediately said `that's mommy's (foster mother's) seat's and "Lionel asked his mother `who are you?'" (State's Exhibit C, September 10, 1990 evaluation, p. 8). In contrast, Dr. Mantell found:
 She [foster mother] is strikingly affectionate with the boys. She praises and encourages each one. The boys relate to her strongly and consistently. The attachment of the boys for their foster mother is ever present. It is perhaps the single most striking finding from this evaluation in its clarity and its continuity. (Id., p. 9.)
Dr. Mantell found "no evidence to indicate that they can be safely returned either to their mother or to any other relative" and recommended that they "either remain in their present foster home . . . to be adopted there or to be gradually prepared for adoption elsewhere." (Id., p. 10)
Adjudication — on facts as of April 20, 1990 (date petition filed)
Since the allegations supporting the pleaded grounds for terminating Sharon's parental rights have not been amended since the date these petitions were filed, April 20, 1990 shall be deemed the adjudicatory date. By that date, Joey and Lionel had been in DCYS foster care for 21 months. In the 15 months following their commitment their mother had visited three times (in January, February and March of 1990). From July of 1988, when these children had been placed in the temporary custody of DCYS, until December of 1989, Sharon's whereabouts were unknown to her children's caretakers, and after October of 1988 she had failed to make any contact of any kind with either the children or their legal guardian, DCYS. In the fifteen months of commitment Sharon had never secured housing of her own, always living with her relatives or those of her most recent boyfriend; she had given birth to one child by Mr. D.D. in April of 1989, custody of whom had been awarded to the father by a New York court when that child was six months old; she had become pregnant for her sixth child; she had not entered any kind of program for the treatment of her four-year drug addiction; she denied ever having neglected her children except for a single episode of leaving them unattended in July of 1988; the boys have come to perceive Mrs. K. as their primary caretaker and, despite seven encounters in eight months, do not know who their mother is. This record provides clear and convincing proof of three of the statutory grounds pleaded for terminating the mother's parental rights: CT Page 79
1) Abandonment — Had DCYS filed these petitions in July of 1989, as it expressed its intention of doing, there would have been as of that time, not only abandonment as defined by statute as the failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child" but also in the common law sense of a total and complete cessation of all contact. Because of changes in caseworkers and excessive caseloads, these petitions were not, in fact, filed until the date required by subsection (e) of sec.46b-129, fifteen months after the date of commitment which was 21 months after foster placement began. By this time, Sharon had reappeared in Connecticut and had begun the process of getting reacquainted with children she had not seen for 14 months. Three visits after more than a year of no contact of any kind does not, however, rise to the dignity of a "reasonable degree of interest, concern or responsibility" within the meaning of the statute. Since the entire period of placement — July 25, 1988 to April 20, 1990 — may be considered, In Re Saba P., 13 Conn. App. 605 (1988) this eleventh hour renewal of interest does not preclude the conclusion that there has been abandonment in the statutory sense.
2) Failure to Rehabilitate — Sharon began taking cocaine to ease discomfort soon after giving birth to Joey in January of 1986. Eight months later she was documented in a hospital record as an I.V. drug user. Since her reappearance in the children's lives in January of 1990, she entered and was discharged from a drug treatment program after minimal cooperation, and soon thereafter gave birth to her sixth child after having returned to using cocaine which showed up in the newborn's system. She did not visit her children or make her whereabouts known to their caretaker until three months before these petitions were filed. She could not be traced during this entire period, through any of her relatives in this state. Her explanation for this prolonged failure is neither consistent nor credible. The child born to her during this was placed in the sole custody of his father, without Sharon being granted visitation rights, by the family court in New York. Her demonstrated ability to provide Joey and Lionel with safe, responsible caretaking was thus no more assured in April of 1990 than it had been in January of 1989 when the children were committed, or in July of 1988 when they had been abandoned. This constitutes clear and convincing proof of this second ground for terminating her parental rights.
3) Lack of parent-child relationship — By her own admission, neither Joey nor Lionel regarded their mother, even after visitation was renewed in January of 1990, as their parent; both clearly perceive Mrs. K. in this role. None of the CT Page 80 witnesses could testify to seeing any manifestation of a parent-child relationship tie between either boy and the mother. Whatever memories might exist of life with their mother can only be a matter of speculation: Based upon the condition both boys were found in at the time of their placement, those memories could only be of neglect and abandonment. In three observed interactions (October of 1988; July and September of 1990) Dr. Mantell found no manifestation of positive feelings for their mother. See In re Jessica M.,217 Conn. 459 469 (1991), citing with approval In Re Juvenile Appeal (84-6), 2 Conn. App. 705, 709 (1984). Indeed, Lionel's query during his seventh meeting with his mother in September of 1990, "Who are you?", suggests that five months earlier, on the adjudicatory date, Sharon would have been still more of a stranger to these children than she was then. Further, both boys have evidenced signs of distress (bedwetting; clinging; tantrums) following visits with their mother suggesting that whatever feelings may have developed after becoming reacquainted following her absence for half their respective lifetimes are neither emotionally beneficial nor sufficiently positive to preclude the finding of this ground for terminating her parental rights. In In Re Juvenile Appeal (Anonymous),181 Conn. 638 (1980), this ground was upheld in the case of a mother separated from her son for over two years who, in an effort to be reunified with him, had visited him fourteen times in seven months. In citing that decision with approval, the Supreme Court in the Jessica M. case stated:
 As a factual matter, the evidence in that case established that the child, who was three and one-half years old at the time of the termination hearing and who had been separated from his mother since the age of eight months, did not appear to recognize his natural mother when she visited, did not respond to her overtures, appeared to avoid her, and identified only his foster parents as his father and mother. Such evidence, we concluded, justified the trial court's determination that no parent-child bond existed, despite the fact that the mother had maintained contact with her son through visitation. In Re Jessica M., supra at 469).
In the instant case, children who were four and three years old at the time of the termination hearing and who had been separated from their mother since the ages of two years and ten months respectively did not recognize Sharon when she first visited (asking "Who are you?" after the seventh visit), did not respond to her overtures, appeared to avoid her, and clearly identified with their foster parent as their mother. CT Page 81 This supports, by clear and convincing proof, the determination that no parent-child bond exists, despite the fact that this mother resumed contact with her sons through visitation following a period of 14 months of total absence.
The lack of a parent-child relationship is not, of itself, grounds to terminate a parent's rights. The court must also find that to permit further time for the establishment or reestablishment of such relationship would be detrimental to the children. The only clinical evidence in this record unequivocally compels the conclusion that there would be serious detriment to both children to withhold permanency longer than the two and a half years that they have already been denied the assurance of a permanent, nurturing home. Even if Mrs. K. cannot adopt these children — and the evidence in this record suggests that she can and will — Dr. Mantell suggested adoption by strangers would be preferable to waiting longer for Sharon to get her life under control. The petitioner has thus provided clear and convincing proof of this third nonconsensual ground for terminating her parental rights.
The petitioner having offered no evidence as to any denial of necessary care, guidance or control by reason of acts of parental commission or omission since July of 1988 when Sharon initially lost custody, the fourth nonconsensual ground pleaded for terminating her parental rights is dismissed.
Disposition — as of December 10, 1990, the final date of hearing.
In the eight months during which these petitions were pending before the final hearing date, Sharon saw these children four more times. The boys appeared to regard hex no differently than when she initially reappeared in their lives in the early part of 1990. She cancelled a scheduled visit in November because of a job interview, and declined an offer of a make-up visit a week later without giving a reason. She cancelled another visit in December claiming to have made a clinic appointment for just that date and time, and then failed to keep that clinic appointment. She has, by her own admission, relapsed into taking cocaine on at least three documented occasions (in May when delivering her sixth child; in June when admitted to the emergency room for a drug overdose; in August, by admission to Dr. Mantell on September 10, 1990). She has twice been discharged from drug treatment programs for nonattendance. She has given birth to a sixth child who was born with cocaine in his urine as a result of her admitted use of the drug prior to delivery. She has consented to the termination of her parental rights in her oldest son and to the transfer of guardianship of her two youngest to Mr. CT Page 82 D.D.'s mother in New York. She continues to deny ever having neglected her children, or that they ever lacked proper care while in her custody.
Before considering termination of her parental rights, the court must give due consideration to the six factors set forth in subsection (d) of Sec. 17-43a:
(1) No services could have been offered to Sharon by DCYS during the extended period that her sons were in foster care and her whereabouts unknown. When she did reappear in their lives, she was afforded a reasonable opportunity to become reacquainted with them and urged to enter a drug treatment program. Without successful completion of the latter, no further services could reasonably have been provided to facilitate reunification. (2) No orders were entered other than to attend court and clinical evaluations with which she complied substantially in 1990. No court expectations were spelled out for her to achieve at the time the children were committed since she did not attend court and her whereabouts were thereafter unknown to DCYS and to her own attorney. (3) The feelings and emotional ties of the children toward their mother, as contrasted with their foster mother, have been clearly delineated by the clinical psychologist: They are closely bonded with their foster mother who has provided excellent care under which they have made up most of their developmental delays which existed when they were in their mother's care; they do not know their mother as any special person to them and have reacted negatively to her visits. (4) Joey was nearly five and Lionel three at the conclusion of these proceedings. They have spent half or more of their respective lifetimes in foster care. Under the care of Mrs. K. they have made startling progress and are clearly bonded to her. They need the assurance of permanency, preferably with her, but if that is not possible then with competent strangers, rather than waiting longer than the 29 months they have already spent in foster care. Children need such assurance by the time they leave the small world of home for the larger world of public school. It is yet not too late for these boys. (5) Sharon has made no visible effort to adjust her circumstances, conduct or conditions to make it in the best interest of these children to return to her care in the foreseeable future. She has done nothing about her addiction to cocaine, having delivered a "cocaine baby" less than a month after these petitions were filed, and having been twice discharged from drug-treatment programs thereafter. She continues to produce children she is incapable of caring for herself, and continues to live in the homes of others. Three months after initiation of this action, her two youngest children were removed from her care under circumstances CT Page 83 strikingly similar to those which caused Joey and Lionel to be placed two years earlier. (6) Nothing prevented Sharon from maintaining a meaningful relationship with these children except for her own neglect of them while in her care, and her abandonment of them thereafter. When she chose to reappear in their lives, 17 months after their original placement in foster care, she was limited to monthly visits. This was not an unreasonable restriction, however, considering the children's negative experiences with their mother when they lived with her, and the long period without contact thereafter.
Having considered the foregoing, it is found to be, by clear and convincing proof, in the best interests of both Joey and Lionel for their mother's parental rights to be terminated so that they may know at last the security of a safe and permanent home that only adoption can bring. Therefore, it is ORDERED that the parental rights of Sharon M. in and to her sons Joseph W. and Lionel J. be, and hereby are, terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing the said children forthwith in adoption and that such Commissioner shall file a written report with this court no later than 90 days following the date of this judgment as to the progress toward such adoption. If these children, or either of them, is not adopted by June 1, 1992, the said Commissioner is further ORDERED to file by that date a Motion to Review Plan for Terminated Child in conformity with the requirements of federal law.
Appeal
The mother has 20 days from the date of this judgment in which to seek an appeal. If, after being informed by trial counsel of the court's judgment and the right to take an appeal, she affirmatively manifests a desire to do so, if such trial counsel is willing to act in that capacity, the court will appoint her for this purpose. If she manifests a desire to take an appeal, and if trial counsel declines to represent the mother because in her professional opinion it lacks merit, such attorney is not required to do so but may file a timely motion to withdraw and to extend time in which to take an appeal. The court will then appoint another attorney to review this record who will, if willing to represent the mother on appeal, be appointed for this purpose. If the second attorney determines that there is no merit to an appeal, he or she is requested to make this known to the court at the earliest possible moment, and the mother will be informed by the clerk forthwith of the balance of the extended appeal period in which to secure her own counsel who, if qualified, may be appointed CT Page 84 to represent her on the appeal. If this is not done, then upon expiration of the extended appeal period, the right to pursue an appeal will be ended and the termination of parental rights final. The child will at that time, and not before, be free to be placed in adoption.
If such procedures satisfy the sixth amendment right to counsel in criminal cases (Douglas v. California, 372 U.S. 353
(1963); Fredericks v. Reincke, 152 Conn. 501 (1965)), they are even more appropriate where there are interests of a third party involved: Those of children whose need for permanent safe parenting is entitled to at least as great a degree of consideration as are those of the parent whose right to raise them is at issue. Even unsuccessful appeals delay permanent planning for years since no child may be adopted until the appellate process is exhausted. The need for finality of judgment in cases where the state initiates legal action against indigent respondents, which gave rise to the rule of Douglas and Fredericks, supra, applies as much or more to cases where the person affected by the judgment is a young child for whom passage of periods of time that may seem short for adults can work changes with lifetime implications.
Entered at Hartford this 1st day of March 1991
BRENNEMAN, JUDGE